## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **CARL WATKINS,** | ) | |
| Plaintiff, | ) | Civil Action No. 2:08cv00056 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| | ) | |
| **MICHAEL J. ASTRUE**, | ) | |
| **Commissioner of Social Security,** | ) | By: GLEN M. WILLIAMS |
| Defendant. | ) | SENIOR UNITED STATES DISTRICT JUDGE |

In this social security case, I will affirm the decision of the Commissioner denying benefits.

### I. Background and Standard of Review

The plaintiff, Carl Watkins, ("Watkins"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying Watkins's claim for supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 1381 *et seq.* (West 2003 & Supp. 2009). Jurisdiction of this court is pursuant to 42 U.S.C.A. §§ 405(g) and 1383(c)(3). (West 2003 & Supp. 2009).

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*,

829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Watkins protectively filed his application for SSI on September 15, 2004, (Record ("R."), at 86-89), alleging disability as of that day,[1] due to problems with his heart, legs, nerves, high cholesterol, arthritis in his knees, back, depression, emphysema and vision problems. (R. at 111.) The claim was denied initially and upon reconsideration. (R. at 72-73.) Watkins then requested a hearing before an administrative law judge, ("ALJ"). (R. at 84.) A hearing was held on June 8, 2006, at which Watkins was present and represented by counsel. (R. at 42-55.)

By decision dated August 14, 2006, the ALJ denied Watkins's claim. (R. at 22-29.) The ALJ found that Watkins had not engaged in substantial gainful activity since the alleged onset date of disability. (R. at 28.) The ALJ found that the medical evidence established that Watkins suffered from severe impairments, namely cervical disc disease, emphysema, status-post suspected old clavicle injury and borderline intelligence. (R. at 28.) However, the ALJ found that those

---

[1] Although Watkins alleged a disability date of July 23, 2004, (R. at 22), he later amended it to September 15, 2004.

impairments did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. at 26, 28.)  The ALJ also found that, Watkins retained the residual functional capacity to perform light work[2] consistent with borderline range of intelligence.  (R. at 29.) The ALJ indicated that Watkins had no transferable skills from previous semi-skilled employment.  (R. at 29.)  The ALJ determined that Watkins could not perform any of his past relevant work, but found that a significant number of jobs existed in the national economy that Watkins could perform, including jobs as a cleaner, a hand packer, a dish washer, an off bearer, an assembler and a machine tender.  (R. at 29.)  Accordingly, the ALJ found that Watkins was not under a disability as defined by the Act and was not entitled to benefits.  (R. at 29.)  *See* 20 C.F.R. § 416.920(f) (2009).

After the ALJ issued his decision, Watkins pursued his administrative appeals and sought review of the ALJ's decision, but the Appeals Council denied his request.[3]  (R. at 7-9, 12-14.)  Watkins then filed this action seeking review of the ALJ's decision, which now stands as the Commissioner's final decision.  *See* 20 C.F.R. § 416.1481 (2009).  This case is now before the court on Watkins's motion for summary judgment, which was filed July 21, 2009, and on the Commissioners motion for summary judgment filed on August 24, 2009.

---

[2] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If an individual can perform light work, that person can also perform sedentary work.  *See* 20 C.F.R. § 416.967(b) (2009).

[3] In an Order dated September 19, 2008, the Appeals Council set aside its previous denial, to consider new evidence.  However, after consideration of the new evidence, Watkins's request for review was denied.  (R. at 7).

*II. Facts*

Watkins was born on August 29, 1955, (R. at 45, 86), which classified him as a "person closely approaching advanced age" under 20 C.F.R. § 416.963(d), at the time of the hearing. However, at the time Watkins filed for SSI he was a "younger person" under 20 C.F.R. § 416.963(c). (R. at 27.) Watkins stated that the tenth grade was the last grade he completed in school; he never went back to get his general equivalency development diploma, ("GED"). (R. at 46.)

Watkins testified that he could not read well, but he could write. (R. at 26.) Watkins told the ALJ that the last job he had was over 15 years ago as a pest exterminator. (R. at 46.) When asked why he felt that he was disabled, Watkins responded that he "can't do a whole lot of walking." (R. at 46.) Watkins explained that his trouble walking resulted from injuring his knee when he was run over by a bull dozer. (R. at 46.) He indicated that walking caused his left knee to "give out," resulting in pain and weakness. (R. at 47.) Watkins testified that he had arthroscopic surgery on his knee three times and could only walk a few minutes before having to sit down. (R. at 47.)

When the ALJ asked Watkins if he had any other problems, Watkins explained that he had lower back pain and did not know whether the pain radiated to his legs, because his legs constantly hurt. (R. at 47-48.) (R. at 47.) In response to questioning from his attorney, Watkins said he was going to have a magnetic resonance imaging, ("MRI"), taken at the University of Virginia, ("UVA"). (R. at 50.) Financial constraints, Watkins claimed, were the reason a MRI had not

previously been performed. (R. at 50.) Watkins also asserted that poor circulation caused him to have weak hands, stating they "go numb" sometimes. (R. at 48.) In addition to the aforementioned problems, Watkins claimed to suffer from heart trouble, which required him to carry Nitroglycerin with him at all times, depression, nerve trouble, emphysema, frequent headaches, sleep apnea and foot pain. (R. at 48, 51.)

Watkins acknowledged that he could drive and that he drove around town "every now and then," and stated that he went to church twice a week. (R. at 49-50.) Watkins testified regarding his interests, that he "like[d] to sit and play Super Nintendo all the time." (R. at 49.) Watkins claimed that he had trouble climbing the one step on his porch which forced him to build a ramp. (R. at 51.) Watkins declared that he smoked a half a pack of cigarettes a day and that he previously smoked three packs a day. (R. at 53.) He claimed to have trouble breathing around fumes and chemicals. (R. at 52.) Watkins asserted that because of his back trouble he could not lift anything, and he elaborated that it was more the motion of carrying, i.e., bending over and lifting, that gave him trouble. (R. at 52.) Watkins stated that he had been on Valium to treat his nerve problems for about a year. (R. at 52.) Watkins further testified that he was supposed to be on three different inhalers, but that he could not afford to buy them. (R. at 53.)

In addition to Watkins, the ALJ heard the testimony of a vocational expert, Norman Hankins. (R. at 53.) Hankins classified Watkins's previous employment as a pest exterminator as semi-skilled work that required medium[4] exertion. (R. at

---

[4] Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or

53.)  The ALJ asked Hankins to consider a hypothetical individual with a ninth grade education and work background, who retained the residual functional capacity for light work activity, an emotional development in the borderline range and an emotional disorder with restrictions regarding his ability to perform work related activities.  (R. at 54.)  Based on the hypothetical, Hankins opined that there would be jobs available to the individual, including working as an office cleaner, a hand packer, a dishwasher and an off bearer from the assembly line.  (R. at 54.)  Additionally, Hankins felt that the individual could do light assembly work and be a machine tender.  (R. at 54.)  Hankins stated that at the sedentary[5] level Watkins would be disabled under the medical vocational guidelines.  (R. at 55.)

In rendering his decision the ALJ considered medical evidence from: Dr. Hossein Faiz, M.D., B. Wayne Lanthorn, Ph.D.; Julie Jennings, Ph.D., a state-agency psychologist; Lee Regional Medical Center, ("LRMC"); Stone Mountain Health Services, ("SMHS");  R.J. Milan, Jr., Ph.D., a state agency psychologist; Dr. Richard Surrusco, M.D., a state agency physician; Lee County Medical Center, ("LCMC"); Lee County Counseling Center/Frontier Health, ("FH"); and Dr. Claude Sader, M.D.  Subsequent to the ALJ hearing, Watkins's counsel submitted records from: Lonseome Pine Hospital, ("LPH"); University of Virginia Health System, ("UVA"); Dr. Gregory Helm, M.D.; Dr. Paul Augistine, M.D.; Mountain View Regional Medical Center, ("MVRMC"); Norton Community Hospital,

carrying of objects weighing up to 25 pounds. If an individual can do medium work, that person can also perform sedentary and light work. *See* 20 C.F.R. §416.967(c) (2009).

[5] Sedentary work involves lifting items weighing up to 10 pounds with occasional lifting or carrying or articles like docket files, ledgers and small tools. *See* 20 C.F.R. § 416.967(a) (2009).

("NCH"); Wise Medical Group, ("WMG"); Dr. S.C. Kotay, M.D.; and additional records from FH, SMHS, Lanthorn and LRMC.[6]

On September 21, 2004, Watkins presented to the LRMC after cutting off the tip of his finger, (R. at 233), after it reportedly got stuck between two motors. (R. at 243.) An x-ray showed a fracture and amputation at the tip of the right fifth finger. (R. at 251.) Dr. Hossein Faiz, M.D. noted a medical history that included knee surgery, an exploratory laparotomy, glaucoma in his right eye, emphysema, seizure disorder, chronic smoking and chest pains, but explained that all cardiac tests were negative. (R. at 229.) On September 22, 2004, Watkins returned to LRMC, as scheduled, to have surgery on his injured finger. (R. at 228-32.) The operation was successful and Watkins was discharged in satisfactory condition. (R. at 230-31.) Following the surgery, on October 10, 2004, Watkins was treated at LRMC for a finger. (R. at 222.)

On September 28, October 5 and October 12, 2004, Watkins was treated by Dr. Faiz at the LRMC following the amputation of his right fifth finger. (R. at 192.) On September 28, 2004, it was noted that the finger was "looking great and viable" and there was no evidence of infection. (R. at 192.) On each of the visits Dr. Faiz prescribed Lortab help alleviate the pain. (R. at 192.)

---

[6] Since the Appeals Council considered this evidence in reaching its decision not to grant review, this court also should consider this evidence in determining whether substantial evidence supports the ALJ's findings. *See Williams v. Sec'y of Dept. of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991).

On November 2, 2004, Watkins presented at LRMC for a chest x-ray. (R. at 625.) The results showed that the heart was not enlarged, the right lung was slightly prominent, there was a calcified lymph node in the right hilum due to previous granulomatous disease, no active infiltration, no acute cardiopulmonary disease process identified and no significant change since August 12, 2004. (R. at 625.)

On March 8, 2005, Watkins presented to LRMC complaining of pressure and sharp pain in his chest. (R. at 207-19.) Watkins assessed the pain as a nine on a 10-point scale, and he claimed that the pain radiated down his left arm. (R. at 209.) The nurse noted that Watkins reported that the pain had persisted for two days and worsened with deep breath and coughs, indicating that the pain could be reproduced with palpitation. (R. at 212.) A chest x-ray revealed emphysema, but was negative for acute process and was unchanged since a November 2004 x-ray. (R. at 218.)

On June 28, 2005, Watkins returned to LRMC complaining of foot pain, and his charts noted a history of gout. (R. at 703-13.) The examination revealed that Watkins was oriented in all spheres. (R. at 707.) Watkins rated the pain in his feet as a nine on a 10-pint scale, claiming that nothing exacerbated or relieved the pain. (R. at 707.) It was discovered that Watkins had fungal infection on his nails with some involvement between his toes; his primary diagnosis was listed as onychomycosis. (R. at 713.)

On November 22, 2005, Watkins was treated at LRMC after complaining of chest pain and dry coughs. (R. at 690-702.) Watkins rated his chest pain as a 10 on a 10-point scale, describing the pain as constant and sharp. (R. at 694.) A chest x-ray did not reveal any abnormalities. (R. at 702.)

Watkins revisited LRMC on January 9, 2006, and reported that he had inhaled kerosene fumes and was suffering from pain in his lungs and nose. (R. at 744-755.) Watkins rated his pain as a six on a 10-point scale, and he claimed that the pain did not radiate. (R. at 748.) Watkins was found to be oriented in all spheres. (R. at 748.) An x-ray revealed mild chronic obstructive pulmonary disease, ("COPD"), a small questionable density in the right apex raising the possibility of nodular density and a follow-up x-ray was recommended. (R. at 755.)

On January 24, 2006, Watkins was treated at LRMC for chest pain and diagnosed with acute coronary syndrome. (R. at 714-44.) Watkins alleged that he moved a bed at his home and 20 minutes later he had a sharp shooting pain in the left side of his chest, which radiated toward the axilla but not the arm, neck or jaw. (R. at 715.) Watkins claimed that the pain worsened when he coughed or took a deep breath. (R. at 715.) Watkins reported that he had a heart attack in 1993, but the doctor on call, Dr. Art Vanzee, M.D., could not find the records that indicated such. (R. at 715.) Dr. Vanzee diagnosed Watkins with atypical chest pain, history

of heavy tobacco dependence, history of hypercholesterolemia and a family history of premature coronary disease.  (R. at 716.)

On December 3, 2006, Watkins was treated at LRMC when he reported a history of neck pain stemming from an old injury and explained that he woke up with neck pain and stiffness.  (R. at 856-63.)  Watkins was found to be alert and oriented in all spheres and exhibited appropriate behavior.  (R. at 859.)  Watkins rated the pain as a 10 on a 10-point scale, which he said was exacerbated by moving and relieved by nothing.  (R. at 859.)  The emergency room doctor diagnosed the pain as a spasm, prescribed Flexeril and recommended alternating hot and cold compresses.  (R. at 863.)

Watkins returned to LRMC on March 30, 2007, this time complaining of wrist pain; Watkins reported that his wrist started hurting 20 minutes prior to his arrival at the emergency room.  (R. at 845-55.)  Watkins described the pain as a 10 on a 10-point scale.  (R. at 849.)  The emergency room physician diagnosed the pain as resulting from a strain in the left forearm.  (R. at 853.)  An x-ray revealed no abnormalities, other than osteoarthritic changes in the left elbow.  (R. at 854.)  Watkins was told to take ibuprofen and apply ice to the affected area for the next 24 hours.  (R. at 855.)

On June 4, 2007, Watkins presented to LRMC and claimed that he had wrist pain and suffered from carpal tunnel syndrome. (R. at 925-33.) Watkins described the pain as a 9 or 10 on a 10-point scale and stated nothing relieved the pain.[7] (R. at 927.) Watkins was given Percocet and was given four additional Percocets to take home with him. (R. at 927.) The emergency room physician opined that Watkins exacerbated his carpal tunnel/neuropathy. (R. at 930.)

On July 22, 2007, Watkins returned to LRMC alleging that he injured his lower back while using his computer. (R. at 615-25.) Watkins rated the pain as a 10 on a 10-point scale and claimed that it was worsened by movement and walking. (R. at 920.) The emergency room physician found that Watkins exacerbated his lumbar disc disease. (R. at 921.)

On August 19, 2007, Watkins was treated at LRMC after he presented and claimed that he felt his blood pressure was elevated. (R. at 905-15.) Watkins reported that he felt dizzy and could not walk straight; additionally, Watkins reported that he was having chest pains. (R. at 908.) The physician on duty found that Watkins had acute dizziness. (R. at 910.)

---

[7] One paragraph states that Watkins rated the pain as a nine, while another states that he rated the pain on a 10-point scale. (R. at 927.)

Julie Jennings, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique Form, ("PRTF"), on December 6, 2004. (R. at 194-206.) Jennings found that Watkins suffered from symptoms of an affective disorder and an anxiety-related disorder. (R. at 194.) Although Jennings found Watkins to suffer from depression, not otherwise specified and an anxiety-related disorder, not otherwise specified, she indicated that the findings did not satisfy the diagnostic criteria. (R. at 197, 199.) Jennings found that Watkins's restriction of activities of daily living, difficulties in maintaining social functioning, difficulties in maintaining concentration, persistence or pace would be mildly limited, while his repeated episodes of decompensation, each of extended duration would not be impacted. (R. at 204.) Jennings noted in her consultant's notes that Watkins reported that he was being treated for anxiety and depression and that he was admitted for examination because of chest pain brought on by witnessing the death of his pet. (R. at 206.) Jennings added in her report that "[b]ased on the evidence of record, [Watkins's] statements are found to be not credible. (R. at 206.)

On January 27, 2004, Watkins presented to SMHS and requested pain medication and stated that another medication, Paxil, which he had been prescribed at the office was not helping. (R. at 607-08.) Watkins was treated by Dr. Abdul-Latief Almatari, M.D., who noted that Watkins had a history of depression and ongoing tobacco abuse. (R. at 607.) Watkins reported that he had been at the emergency room two days prior to this particular visit due to left hand and shoulder pain. (R. at 607.) Dr. Almatari noted that an x-ray of Watkins's left hand showed a metallic foreign object in the soft tissue, but Watkins claimed no

knowledge of a trauma or injury. (R. at 607.) Watkins told Dr. Almatari that Naprosyn had improved his gout. (R. at 607.) Dr. Almatari's assessment indicated that Watkins's hand pain was mostly brought on by the foreign object, that Watkins had left shoulder pain, depression and continued tobacco dependence. (R. at 608.) Dr. Almatari recommended that Watkins stop smoking and advised him to continue taking Naprosyn, as well as the Indocin he was prescribed at the emergency room. (R. at 608.)

On February 26, 2004, Watkins returned to SMHS and was once again treated by Dr. Almatari. (R. at 606.) Watkins reported pains localized to the metacarpal area, which was similar to what was reported at his previous visit. (R. at 606.) Dr. Almatari's assessment of Watkins revealed arthritis, onychomycosis, ongoing tobacco abuse and depression. (R. at 606.) Dr. Almatari once again encouraged Watkins to stop smoking and placed him on Bextra and Itraconazole. (R. at 606.)

On March 24, 2004, Watkins returned to SMHS for a follow-up with Dr. Almatari. (R. at 604-05.) When Watkins presented to Dr. Almatari he complained of chronic headaches, which were exacerbated by stress. (R. at 604.) Watkins alleged that the pain was not relieved by Bextra, Ultram or Darvocet. (R. at 604.) Watkins requested pain medication and reported that he was not experiencing chest pain, shortness of breath, nausea, vomiting, chills or change in vision. (R. at 604.) (R. at 604.) Dr. Almatari noted that Watkins had chronic headaches, depression

and continued tobacco dependence.  (R. at 604.)  Dr. Almatari intended to refer Watkins to a neurologist for his headaches, but Watkins informed him he could not afford to see a neurologist.  (R. at 604.)  Dr. Almatari prescribed Watkins Amitriptyline for depression and Darvocet for pain management.  (R. at 604.) Additionally, Dr. Almatari recommended that Watkins exercise, reduce stress and stop smoking.  (R. at 605.)

On June 8, 2004, Watkins presented to Dr. Almatari at SMHS complaining of coughing, blacking out when he coughed and "yellowish-greenish sputum."  (R. at 602-03.)  Watkins reported that he coughed so hard "he [could not] hold his breath."  (R. at 602.)  Watkins admitted that he smoked a pack of cigarettes a day, and reported that he was not experiencing weakness, chest pain, fever, chills, nausea, abdominal pain or vomiting. (R. at 602.)  Dr. Almatari noted that Watkins was alert and oriented, that Watkins did not display acute distress, was pleasant and that he "look[ed] much better this visit than prior visits."  (R. at 602.)  Dr. Almatari's assessment of Watkins resulted in the following findings: cough, bronchitis, depression, ongoing tobacco abuse, improved chronic headache, arthritis and hyperlipidemia.  (R. at 603.)  Dr. Almatari directed Watkins to continue taking Amitriptyline and also prescribed Bactrim and Norel.  (R. at 603.) Watkins was again advised to stop smoking.  (R. at 603.)

On July 19, 2004, Watkins was treated by Dr. Almatari after being discharged from the hospital, where he was placed under observation for reported

chest pain. (R. at 600-01.) Dr. Almatari noted that Watkins developed the chest pain after watching his animal die and that Watkins had similar symptoms in the past after an argument. (R. at 600.) Watkins described right-side chest pain stating that it worsened with movement and was not associated with shortness of breath or diaphoresis. (R. at 600.) Watkins also complained of abdominal distention, bloating, acid reflux and sleep apnea; Watkins's spouse reported that Watkins occassionally stopped breathing at night. (R. at 600.) Dr. Almatari's assessment included gastroesophageal reflux disease, right chest wall pain, anxiety, ongoing tobacco abuse, hyperlipidemia and sleep apnea. (R. at 601.) Dr. Almatari prescribed Watkins Valium, Lortab and Reglan, and he advised Watkins to stop smoking, eat healthy, exercise and decrease his salt intake. (R. at 601.)

On September 14, 2004, Watkins returned to SMHS with complaints of lower back pain. (R. at 597, 599.) Watkins reported that he fell in his yard a week prior to his visit, causing lower back pain and soreness. (R. at 599.) Watkins admitted that the pain did not inhibit his ability to walk and did not radiate to his feet. (R. at 599.) Watkins also informed Dr. Almatari that he had visited a doctor regarding his sleep apnea and was told it could be the result of periodic leg movement during sleep. (R. at 597.) Dr. Almatari's assessment was the same as previous visits with the inclusion of periodic leg movement during sleep and lower back pain resulting from a fall. (R. at 597.) Dr. Almatari recommended that Watkins stop smoking, use a heating pad and massage as necessary and continue taking Vioxx, Lortab and Valium. (R. at 597.)

On December 14, 2004, Watkins returned to SMHS and reported left knee pain, muscle spasms and back pain. (R. at 589-90.) With regard to the back pain, Watkins claimed he fell while walking in his yard two weeks prior, and when asked why he did not report it earlier, Watkins replied that it was not bothering him. (R. at 589.) Watkins also alleged that his knee "gives out" and contributed that to a past knee surgery. (R. at 589.) Watkins requested to renew his Lortab prescription and try a different anti-depressant medication. (R. at 589.) Dr. Almatari assessed Watkins as having low back pain from a fall, muscle spasms, anxiety, depression, chronic left knee pain, ongoing tobacco abuse and he noted Watkins had made multiple visits to the emergency room. (R. at 589.) Dr. Almatari further noted that an x-ray of Watkins taken the day prior to the visit showed no abnormalities. (R. at 590.) Dr. Almatari prescribed Anabar and Zoloft and advised Watkins to continue taking Valium and Lortab. (R. at 590.) Additionally, Dr. Almatari consulted with a second doctor regarding Watkins's back pain and recommended that Watkins decrease his visits to the emergency room and stop smoking. (R. at 590.)

On January 13, 2005, Watkins presented to Dr. Almatari and reported a headache "on the right side of his face with eye pain," which he attributed to glaucoma. (R. at 587.) Watkins told Dr. Almatari that another doctor had diagnosed him with glaucoma two years prior. (R. at 587.) Watkins also reported that Anabar helped his pain and Zoloft helped his depression. (R. at 587.) Dr. Almatari assessed Watkins with headaches, anxiety, arthritis, depression, ongoing tobacco abuse and a history of glaucoma. (R. at 587.) Dr. Almatari advised

Watkins to stop smoking and substituted Novasal for Zoloft, since SMHS was out of Zoloft.  (R. at 587-88.)

On February 21, 2005, Watkins revisited SMHS and complained of chronic joint and low back pain.  (R. at 586.)  Dr. Almatari assessed Watkins and noted arthritis, back pain, hyperlipidemia, anxiety, depression and continued tobacco abuse.  (R. at 586.)  Dr. Almatari once again advised Watkins to stop smoking and gave him more Novasal.  (R. at 586.)

On March 15, 2005, Watkins presented to Dr. Almatari and complained of continued chest pain, after having sought treatment at the emergency room.  (R. at 585.)  Dr. Almatari's assessment revealed chest wall pain, gastroesophageal reflux disease, ("GERD"), anxiety, depression and ongoing tobacco abuse.  (R. at 585.)  Dr. Almatari recommended conservative treatment with Lortab and again Watkins to quit smoking.  (R. at 585.)

On April 7, 2005, Watkins returned to SMHS and reported left chest wall pain that worsened when he elevated his arm, explaining that the pain was not associated with shortness of breath or work exertion.  (R. at 582-83.)  Watkins also claimed that he quit smoking and felt much better.  (R. at 582.)  Dr. Almatari noted that Watkins had chest wall pain, muscle spasm, GERD, anxiety and a remote

history of tobacco abuse.  (R. at 582.)  Dr. Almatari renewed Watkins's prescription and advised him to follow up if his conditions worsened.  (R. at 583.)

On September 6, 2005, Watkins presented at SMHS complaining of feet pain and arthritis.  (R. at 677.)  Watkins described the pain as a burning pain, and it was noted that Watkins was not diabetic.  (R. at 677.)  Dr. Almatari's assessment included osteoarthritis, feet pain, anxiety and tobacco abuse.  (R. at 677.)  At a visit on November 6, 2005, it was noted by Dr. Almatari that Watkins was not experiencing chest pain.  (R. at 675.)  On November 8, 2005, Watkins reported to SMHS that after working on his car the skin on his left hand began peeling.  (R. at 673.)  Dr. Almatari concluded that this was caused by chemical contact dermatitis. (R. at 673.)  At a visit on December 8, 2005, Watkins reported that he was not experiencing chest pain; however, he did report left knee pain.  (R. at 671.) Watkins presented on January 11, 2006, complaining of acid reflux and difficulty sleeping, and he also reported that he had quit smoking.  (R. at 668.)  Dr. Almatari's assessment produced no new findings or diagnoses.  (R. at 668.)

On February 8, 2006, Watkins presented to SMHS for a follow-up after a hospitalization due to chest pain.  (R. at 666.)  He was treated for atypical chest pain by Dr. VanZee, who ruled out myocardial infarction.  (R. at 666.)  Watkins was referred by Dr. VanZee to Dr. Sader for a cardiac stress test and a follow-up appointment; however, Watkins did not comply with that instruction.  (R. at 666.) Dr. Almatari's assessment showed chest wall pain, atypical chest pain, anxiety,

GERD, hyperlipidemia and a remote history of tobacco abuse. (R. at 666.) Dr. Almatari referred Watkins to Dr. Sader for further evaluation and treatment. (R. at 666.)

On March 3, 2006, Watkins returned to SMHS complaining of chronic back pain, and he reported that he was not experiencing any chest pain. (R. at 664.) On March 9, 2006, an x-ray was taken of Watkins's chest after he complained of chest pain and shortness of breath; however, the test revealed no abnormalities. (R. at 682-84.)

Watkins returned to SMHS on May 17, 2006, and presented to Dr. Almatari, where he reported back pain with radiation to his feet and numbness and "tingling" in his feet. (R. at 822-23.) Dr. Almatari diagnosed Watkins with chronic back pain, osteoarthritis, anxiety, hyperlipidemia, remote history of tobacco use and coronary artery disease post myocardial infarction. (R. at 822.) Dr. Almatari gave Watkins samples of Celebrex, Valium and Lortab, counseled him to stop smoking and advised him to use a heating pad and massage therapy. (R. at 823.) Dr. Almatari also noted that Watkins may need to be referred to UVA for an x-ray of his back and possibly an MRI. (R. at 823.)

On June 19, 2006, Watkins presented to Dr. Almatari due to back pain, left knee pain and to get his prescription refilled.[8] (R. at 820.) Watkins denied that he was experiencing chest pain or shortness of breath. (R. at 820.) Dr. Almatari found that Watkins suffered from left knee pain, osteroarthritis, anxiety and coronary artery disease. (R. at 820.) On September 18, 2006, Watkins presented to SMHS and requested an inhaler, after being diagnosed with COPD, and Dr. Almatari renewed his prescriptions. (R. at 809.)

On October 18, 2006, Dr. Almatari noted concern over whether Watkins was abusing his medication. (R. at 805-06.) Dr. Almatari stated that Watkins prematurely attempted to refill prescriptions of Lortab and Valium and explained that he planned to reevaluate the situation after a drug screen was conducted. (R. at 806.) On November 20, 2006, Watkins presented to Dr. Almatari and complained of back and leg pain and requested Lortab. (R. at 802.) Dr. Almatari noted that the drug screen revealed benzodiazepines and opiates, but stated that he was prescribed such medications by SMHS. (R. at 802.) Dr. Almatari diagnosed Watkins with chronic back pain, leg pain, coronary artery diseases status post myocardial infarction, osteoarthritis, onychomycosis and hyperlipidemia. (R. at 802.) Dr. Almatari also referred Watkins to another doctor due to the chronic back pain and leg pain. (R. at 803.) An x-ray of Watkins back, taken on November 21, 2006, revealed mild degenerative change, but no fracture. (R. at 801.) Dr. Almatari advised Watkins to avoid heavy lifting and prolonged sitting or standing.

---

[8] The record described Watkins as a "black male" at this particular visit while all others denoted that he was a "white male;" the court presumes this is a typographical error. (R. at 820.)

(R. at 799.)  On May 17, 2006, Watkins returned to SMHS for a follow-up reporting complaints similar to those reported in prior visits.  (R. at 794.)

On January 3, 2007, Watkins returned to SMHS and reported numbness and tingling in his legs and he stated that a chiropractor told him curves on his back and neck caused his trouble.  (R. at 798.)  Thus, Watkins requested a referral to an orthopedic doctor.  (R. at 798.)  On March 5, 2007, Watkins reported shortness of breath and back pain.  (R. at 869-70.)  Dr. Almatari urged Watkins to stop smoking and gave him another inhaler.  (R. at 869.)  At a follow-up visit on April 5, 2007, Watkins complained of back and left wrist pain.  (R. at 866-67.)  Dr. Almatari changed Watkins's medication of Zocor to Crestor and renewed his Lortab prescription.  (R. at 866.)

On May 29, 2007, Watkins visited a different SMHS office, and it was noted that Watkins was seeking to "establish [a] primary care physician because [Dr. Almatari was] trying to take his [medications] away."  (R. at 887.)  At a follow-up appointment on June 28, 2007, Watkins requested Lortab for hand pain and told the doctor he had been diagnosed with carpal tunnel syndrome.  (R. at 885.)  Dr. Paul Augustine, M.D., prescribed Lortab to Watkins and ordered a nerve conduction study.  (R. at 884.)  An electromyogram and nerve conduction study conducted on Watkins at NCH on June 29, 2007, revealed "minimal demyelinating lesion of the right median nerve at the wrist, consistent with mild right carpal tunnel syndrome."  (R. at 892.)  On August 1, 2007, Watkins complained of

restless leg syndrome, which allegedly caused sleep difficulties. (R. at 881.) Dr. Augustine noted that an x-ray of Watkins's knee was unremarkable and that the nerve conduction study showed only mild right carpal tunnel syndrome. (R. at 881.) Additionally, Dr. Augustine reported that Watkins's lumbar spine x-ray showed mild scoliosis and mild degeneration with some osteophytes at multiple levels. (R. at 881.) Dr. Augustine diagnosed Watkins with mild diastolic hypertension, restless leg syndrome, insomnia, chronic cigarette smoking, chronic lumbago and COPD. (R. at 880.) As such, Dr. Augustine prescribed Vasotec, Elavil and instructed Watkins to continue taking Lortab. (R. at 880.) On May 23, 2008, Watkins reported that he re-injured his back and that he planned to see his orthodontist. (R. at 1001.)

Watkins was examined by B. Wayne Lanthorn, Ph.D, a psychologist with the Virginia Department of Rehabilitative Services, on March 29, 2005. (R. at 575-81.) Lanthorn was evaluating Watkins's claim of disability due to problems with his heart, legs, nerves, high cholesterol, arthritis in his knees, back pain, depression, emphysema and vision difficulties. (R. at 575.) Lanthorn noted that Watkins drove regularly, ambulated to the office with some difficulty, displayed a blunted affect and was blunted in his verbalizations. (R. at 575.) Lanthorn was provided with Watkins's reports of his medical history and a copy of a physician note from SMHS; no other information was given to Lanthorn. (R. at 576.)

Watkins reported that he suffered from chest pain for which he was hospitalized on several occasions, indicating that the doctors could not find anything wrong. (R. at 576.) Watkins speculated that Vioxx, a medication he had been prescribed, could have caused his problems. (R. at 576.) Watkins further alleged that he suffered a heart attack in 1990 and had been catheterized twice. (R. at 576.) Watkins claimed that he suffered from back pain, which was aggravated by a tailbone injury. (R. at 576.) Watkins told Lanthorn that he had leg pain, stemming from a bulldozer accident which immobilized him. (R. at 576.) Additionally, Watkins stated that he was diagnosed with emphysema in 1997, had cut the tip of his finger off and had two past knee surgeries. (R. 576.) Watkins claimed that he did not drink anymore, but acknowledged that at one point he would have been considered an alcoholic and he admitted that he experimented with cocaine and marijuana. (R. at 576-77.) Watkins reported to Lanthorn that he smoked a half of a pack of cigarettes a day and that in the past he smoked three packs a day. (R. at 577.)

Watkins claimed he last worked in 1986 for MasterClean in Winston-Salem, North Carolina. (R. at 577.) Watkins stated that he worked for a company removing asbestos for three years, was an automechanic for five to six years, drove a garbage truck for 12 years, worked for a termite control agency on and off for six years and was first employed at age 13 on a part-time basis at a sawmill. (R. at 577.)

Lanthorn noted that Watkins was oriented in all spheres.  (R. at 577.)
Lanthorn reported that Watkins displayed no evidence of any psychotic process or
delusional thinking.  (R. at 578.)   Watkins complained that he experienced
decreased energy, increased fatigue and sexual difficulties.  (R. at 578.)  Lanthorn
stated that Watkins focused on his poor health and was frustrated because he was
physically unable to do what he wanted.  (R. at 578.)

Watkins reported that he typically went to bed between 4:00 and 5:00 a.m.
and did not wake up until between noon and 1:00 p.m.  (R. at 578.)  Watkins stated
his days were predominantly spent playing games on the computer or watching
television.  (R. at 578.)  Watkins claimed that his wife took care of the housework,
but acknowledged that he tried to do some cooking and explained that he hired
someone to do the yard work.   (R. at 578.)   Lanthorn opined that Watkins's
initiative and effectiveness appeared to be more affected by his physical health
problems than mental troubles.  (R. at 579.)   Watkins claimed that prior to his
worsened condition he walked a lot, traveled to Kingsport, Tennessee and had
enough energy "to walk all the way to Bristol, Tennessee."  (R. at 579.)

Lanthorn was of the opinion that Watkins could relate to and communicate
with others and had the intellectual capacity to manage his own resources and
funds.  (R. at 579.)  Lanthorn diagnosed Watkins with depressive disorder, not
otherwise specified, alcohol dependence in sustained full remission, nicotine
dependence, borderline intellectual functioning, back and leg pain, associated

arthritis, elevated cholesterol, emphysema and noted that Watkins had financial concerns. (R. at 580-81.) Lanthorn assessed Watkins's with a then-current Global Assessment of Functioning, ("GAF"), score of 65.[9] (R. at 581.) Lanthorn opined that Watkins could benefit from counseling and without counseling his prognosis for change was fair at best. (R. at 581.)

Lanthorn also completed a Medical Assessment Of Ability To Do Work-Related Activities (Mental). (R. at 580.) Lanthorn noted no limitations as to Watkins's ability to remember locations and work-like procedures, understand and remember simple and/or detailed instructions and interact socially. (R. at 580.) he found that Watkins's had minor limitations with regard to his ability to sustain concentration and persistence. (R. at 580.) Lanthorn opined that Watkins had the ability to maintain socially appropriate behaviors and hygiene, respond appropriately to changes in the work setting and be aware of and take precautions to avoid hazards. (R. at 580.) Lanthorn felt that "no significant limitations [were] present." (R. at 580.)

Lanthorn completed another Assessment Of Ability To Do Work-Related Activities (Mental) on July 27, 2007. (R. at 875-77.) Lanthorn assessed Watkins's

---

[9] The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994). A GAF of 61-70 indicates that "[s]ome mild symptoms ... OR some difficulty in social, occupational, or school functioning ... , but generally functioning pretty well, has some meaningful interpersonal relationships." DSM-IV at 32.

ability to follow work rules, function independently, understand, remember and carry out simple job instructions and maintain personal appearance as fair; and Watkins's ability to relate to co-workers, deal with the public, use judgment with the public, interact with supervisors, deal with work stresses, understand, remember and carry out detailed and complex job instructions, behave in an emotionally stable manner, relate predictably in social situations and demonstrate reliability as poor.[10]  (R. at 875-77.)  Additionally, Lanthorn opined that Watkins could not manage benefits in his own interest and would miss more than two days of work a month.  (R. at 877.)

A consultative examination of Watkins was performed by R.J. Milan, Jr., Ph.D., a state agency psychologist, on March 29, 2005.  (R. at 646-47.)  A PRTF was completed by Milan on May 25, 2005.  (R. at 634-45.)  Milan suggested that a Residual Functional Capacity assessment be performed based upon symptoms of organic medical disorders and affective disorders.  (R. at 634.)  Milan noted that medically determinable impairments existed that did not satisfy the appropriate diagnostic criteria, those being, borderline intellectual functioning and depression, not otherwise specified.  (R. at 635, 637.)  Milan noted mild limitations with regard to Watkins's restriction of activities of daily living, difficulties in maintaining social functioning, difficulties in maintaining concentration, persistence or pace and noted no limitations in repeated episodes of decompensation.  (R. at 644.)

---

[10] With regard to Elswick's ability to maintain attention/concentration Lanthorn marked both fair and poor.  (R. at 875.)

Milan completed a Mental Residual Functional Capacity Assessment on May 26, 2005. (R. at 648-50.) Milan opined that Watkins's ability to remember locations and work-like procedures, carry out, understand and remember short and simple instructions, maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances, work in coordination with or proximity to others without being distracted by them, sustain an ordinary routine without special supervision, complete a normal workday and workweek without interruptions from psychologically based symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, get along with coworkers or peers without distracting them or exhibiting behavioral extremes, maintain socially appropriate behavior, adhere to basic standards of neatness and cleanliness, respond appropriately to changes in the work setting, be aware of normal hazards and take appropriate precautions, travel in unfamiliar places or use public transportation and set realistic goals or make plans independently of others to be "not significantly limited." (R. at 648-49.) Milan found Watkins's ability to carry out, understand and remember detailed instructions to be "moderately limited" and indicated that there was "no evidence of limitation" with respect to Watkins's ability to make simple work-related decisions and ask simple questions or request assistance. (R. at 648-49.)

A Physical Residual Functional Capacity Assessment was completed by Dr. Richard M. Surrusco, M.D., a state agency physician, on December 2, 2004.[11]  (R. at 651-57.)  Dr. Surrusco noted that Watkins had a primary diagnosis of chronic lung disease and a secondary diagnosis of cervical degenerative disc disease.  (R. at 651.)  Dr. Surrusco found that Watkins could occasionally lift and/or carry items weighing up to 20 pounds, frequently lift and/or carry items weighing up to 10 pounds, sit, stand and/or walk for 6 hours out of the typical eight-hour workday and that Watkins's ability to push and/or pull was unlimited.  (R. at 652.)  Dr. Surrusco opined that Watkins could frequently climb, stoop, balance, kneel, crouch and crawl.  (R. at 653.)  Dr. Surrusco did not report any visual or manipulative limitations, but found that Watkins should avoid concentrated exposure to extreme heat or cold, humidity, fumes, odors, dusts, gases and poor ventilation.  (R. at 654.) Dr. Surrusco found no limitations as to Watkins's exposure to wetness, noise, vibration and hazards.  (R. at 654.)

Watkins was treated periodically at the Lee County Counseling Center, also known as Frontier Health, from August 25, 2005, to April 19, 2006, by Ralph Ott, LPC.  (R. at 758-80.)  In his intake interview, performed on November 4, 2005, Watkins informed FH that his lawyer referred him because he was trying to get disability, and also explained that his physical limitations made him irritable.  (R. at 767.)  Watkins reported that he first applied for disability in 1991, but he had not been successful despite having suffered three heart attacks.  (R. at 767.)  Watkins's

---

[11] The findings of Dr. Surrusco were reviewed and affirmed on May 26, 2005, by a doctor whose name is illegible.  (R. at 655.)

"Presenting Problems" included problems coping with daily living and depression or mood disorder. (R. at 767-68.) In reviewing his symptoms, Watkins reported moderate decreased energy or fatigue, academic or work inhibition, social withdrawal, anxiety, jitteriness, avoidance behavior, somatization, poor attention or concentration, blunted or flat affect, irritability, loss of interest or pleasure, marked mood shifts, insomnia and worrying; he also reported mild panic attacks, disorganization, low self-esteem, hopelessness, helplessness, anger, diminished ability to think, indecisiveness and aggression or rage. (R. at 769-71.) The assessment also revealed Watkins had dysthymic disorder and environmental problems such as limited social contact, limited education and low income. (R. at 772.) Watkins was assessed with a GAF then-current of 55.[12] (R. at 772.) When asked to identify symptoms of withdrawal, Watkins indicated that he experienced "shakes, blood in stools and anger/violence." (R. at 775.) Watkins admitted a history of drinking alcohol and stated that his father was a heavy drinker. (R. at 766, 774-75.) Watkins reported that he had heart disease, three previous knee surgeries and noted that he suffered from chronic back pain. (R. at 777.)

At an appointment on November 18, 2005, Watkins reported that he was getting out more, but claimed that he was still unable to work gainfully. (R. at 765.) Watkins complained that his disability applications had been denied multiple times, stating the his wife's SSI compensation did not provide them much money. (R. at 765.) Ott noted on January 25, 2006, that he had not seen Watkins in several

_____

[12] A GAF of 51-60 indicates "[m]oderate symptoms ... OR moderate difficulty in social, occupational, or school functioning ...." DSM-IV at 32.

months and indicated that the file would be closed if Watkins did not contact him, (R. at 763), but Watkins contacted him to resume treatment. (R. at 762.)

On February 22, 2006, Watkins informed Ott that he had decided to resume treatment because his attorney thought he needed treatment for his anxiety. (R. at 761.) Watkins reported anxiety over the belief that his wife's purse had been stolen, but he later learned that an employee at a retail store found and returned it. (R. at 761.) Additionally, Watkins reported that he had presented to the emergency room with chest pains, but noted that tests did not show any abnormalities. (R. at 761.) In addition, Watkins claimed that his nerve medication was not strong enough. (R. at 761.) Ott noted that Watkins showed evidence of social anxiety and displayed a serious mood. (R. at 761.) Ott opined that Watkins was functional and able to socialize and engage in productive daily activities. (R. at 761.)

On March 22, 2006, Watkins reported financial concerns regarding how to pay for a heart specialist. (R. at 760.) Watkins explained that he had been keeping busy with odd jobs and that his primary care physician was not concerned about his health or nerves and was reluctant to prescribe him medication. (R. at 760.) Also, Watkins denied "significant depression," but claimed his financial situation kept him depressed. (R. at 760.) Ott found that Watkins's biggest stressor was his health and his ability to afford medical bills, and noted that Watkins denied panic attacks and the fact that his chest pain was likely related to his anxiety. (R. at 760.)

A Medical Source Statement Of Ability To Do Work-Related Activities (Mental) was completed by Ott on January 23, 2007. (R. at 827-29.) Watkins was found to be moderately limited in his ability to carry out, understand and remember short, simple instructions, make judgments on simple-work related decisions and interact appropriately with supervisor(s) and co-workers; additionally, it was opined that Watkins would suffer "marked" limitations in his ability to carry out, understand and remember detailed instructions, interact appropriately with the public, respond appropriately to work pressures in a usual work setting and respond appropriately to changes in a routine work setting. (R. at 828.) Ott based the foregoing assessment on Watkins's "[h]istory of anxiety and marginal functional capacity," which he found would interfere with Watkins's ability to carry out job instructions. (R. at 827.) Additionally, Ott relied on Watkins's history of social anxiety, poor social skills and poor hygiene, which Ott found would contribute to Watkins's difficulty responding appropriately. (R. at 828.)

Watkins returned to FH on January 2, 2007, for a crisis intervention consultation. (R. at 902-05.) Watkins stated that he was told by his chiropractor that he needed counseling, so he decided to return to FH. (R. at 903.) Watkins reported to Ott that he had been turned down for disability 16 times and that he first applied in 1989. (R. at 903.) Ott gave a provisional diagnosis of depression, not otherwise specified, and assessed Watkins with a GAF of 60. (R. at 904.) Ott noted that Watkins has "long term, chronic problems with anxiety and depression secondary to chronic illness and disability." (R. at 904.)

Watkins was treated by a cardiologist, Dr. Claude Sader, M.D., on March 3, 2006, and March 9, 2006. (R. at 783-88.) Watkins presented to Dr. Sader and complained of chest pain, palpitations, shortness of breath and syncope, which had all lasted for years. (R. at 783.) Watkins reported that the chest pain was brought on by cold and occurred at rest and was not relieved by additional rest. (R. at 783.) On March 9, 2006, Watkins submitted for an echocardiogram, which revealed low normal systolic function and trace MR with left atrial enlargement. (R. at 786.) A duplex doplar carotid ultrasonogram showed very minimal intraluminal wall thickening without evidence of any focal plaque and the velocities did not show any evidence of remarkable stenosis. (R. at 787.) Additionally, a persantine cardiolite stress test was performed and indicated no evidence of reversible ischemia by nuclear imaging and a mildly dilated left ventricular at rest and stress. (R. at 786-88.) All other areas assessed were normal. (786-88.)

Watkins presented at LPH on May 25, 2007, complaining of pain in his right wrist and hand. (R. at 952-61.) Watkins's pain was found to have been caused by carpal tunnel syndrome, and he was given Percocet and sent home. (R. at 959.)

An electromyagram, ("EMG"), was taken of Watkins's hand at UVA on November 2, 2007. (R. at 963-65.) The test was administered and evaluated by Dr. Gregory Helm, M.D., who found that the EMG confirmed carpal tunnel syndrome on the right side. (R. at 964.) Dr. Helm advised Watkins to purchase a wrist splint and wear it for several months. (R. at 964.) Despite the fact that Dr.

Helm recommended that Watkins try the splint for several months, Watkins called on November 7, 2007, and claimed that the splint did not help and that he wanted surgery. (R. at 970.)

Watkins was treated at the Wise Medical Group, on January 15, 2008, Dr. S.C. Kotay, M.D., and he reported that Watkins claimed that he had trouble with his hands, which caused him to wake up in the middle of the night. (R. at 985.) Dr. Kotay noted that Watkins had multiple injuries in the hand and indicated that the current problems manifested only in the past year, while the injury occurred a "long, long time ago." (R. at 985.) An EMG confirmed carpal tunnel syndrome, but an x-ray of the right wrist did not show any fractures or arthritis and the joints were normal. (R. at 985.) Dr. Kotay opined that Watkins would require corrective surgery, and a carpal tunnel release was scheduled. (R. at 985.) Dr. Kotay informed Dr. Augustine, that during a preoperative examination, a chest x-ray of Watkins revealed a granulomatous lesion in the lung fields. (R. at 983.) Dr. Kotay performed the carpal tunnel release on January 1, 2008, at Mountain View Regional Medical Center. (R. at 1009.)    Watkins reported on January 28, 2008, that the carpel tunnel release relieved all the numbness in his hand. (R. at 992.) Dr. Kotay noted that the finger movements were okay and the wound was healing nicely. (R. at 992.) On February 11, 2008, Watkins presented for a follow-up, and Dr. Kotay noted that any pain was likely related to the scar. (R. at 990.)

On February 13, 2008, a computerized axial tomography, ("CT"), scan was taken of Watkins's chest. (R. at 981-82.) The scan showed old healed granulomatous disease with calcified density in the right apex and calcified lymph node in the mediastinum and hilum. (R. at 981.) However, the CT scan did not show any identifiable neoplastic lesion. (R. at 982.) On February 15, 2008, an x-ray was taken of Watkins's chest; other than COPD, no abnormalities were found. (R. at 980.)

A MRI was taken of Watkins's lumbar spine on May 21, 2008, at the Holston Valley Imaging Center. (R. at 998.) The MRI showed moderate disc space narrowing and mild loss of signal intensity at L5-S1. (R. at 998.) Additionally, the technician noted that there may be minimal bulging disc at L4-5 with some possible narrowing of the neural foramina. (R. at 998.) The radiologist opined that at the right L5-S1 there were some small, but free, herniated disc fragment with discrete focal asymmetric impression on the thecal sac on the right side. (R. at 999.)

*III. Analysis*

The Commissioner uses a five-step process in evaluating SSI claims. *See* 20 C.F.R. § 416.920 (2009); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). The process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the

34

requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. § 416.920 (2009). If the Commissioner finds conclusively that a claimant is or is not disabled at any point in the process, review does not proceed to the next step. *See* 20 C.F.R. § 416.920(a) (2009).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once a claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. §1382c(a)(3)(A)-(B) (West 2003 & Supp. 2009); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By decision dated August 14, 2006, the ALJ denied Watkins's claim. (R. at 22-29.) The ALJ found that Watkins had not engaged in substantial gainful activity since the alleged onset date of disability. (R. at 28.) The ALJ found that the medical evidence established that Watkins suffered from sever impairments, namely cervical disc disease, emphysema, status-post suspected old clavicle injury and borderline intelligence. (R. at 28.) However, the ALJ found that those impairments did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 26, 28.) The ALJ also found that, Watkins retained the residual functional capacity to perform light work consistent

with borderline range of intelligence. (R. at 29.) The ALJ indicated that Watkins had no transferable skills from previous semi-skilled employment. (R. at 29.) The ALJ determined that Watkins could not perform any of his past relevant work, but found that a significant number of jobs existed in the national economy that Watkins could performing, including jobs as a cleaner, a hand packer, a dish washer, an off bearer, an assembler and a machine tender. (R. at 29.) Accordingly, the ALJ found that Watkins was not under a disability as defined by the Act and was not entitled to benefits. (R. at 29.) *See* 20 C.F.R. § 416.920(f) (2009).

Watkins argues that the ALJ erred in determining that he did not suffer from a severe non-exertional impairment other than borderline intelligence. (Plaintiff's Brief in Support of Motion for Summary Judgment, ("Plaintiff's Brief"), at 5-6.) Specifically, Watkins contends that the ALJ's decision is not supported by substantial evidence, claiming that the evidence reveals that he is further limited by anxiety and depression. (Plaintiff's Brief. at 6.) Watkins also claims that the ALJ erred in determining his residual functional capacity. (Plaintiff's Brief at 7-8.) In particular, Watkins asserts that the ALJ erred by not including limitations consistent with his emphysema, arguing that he is "totally disabled" based upon his combination of problems. (Plaintiff's Brief. at 8.)

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by

substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays,* 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Specifically, the ALJ must indicate that he has weighed all relevant evidence and must indicate the weight given to this evidence. *See Stawls v. Califano*, 596 F.2d 1209, 1213 (4th Cir. 1979.) While an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. § 416.927(d), if he sufficiently explains his rationale and if the record supports his findings.

The court will first address Watkins's claim that the ALJ erred in determining that he did not suffer from a severe non-exertional impairment, other than borderline intelligence. (Plaintiff's Brief at 5-6.) Watkins argues that he suffers from additional severe impairments, i.e., depression and anxiety. (R. Plaintiff's Brief at 6.)

Watkins points out that he was diagnosed with depression and placed on Paxil CR on December 9, 2003, by Dr. Almatari. (Plaintiff's Brief at 6, R. at 609.) Dr. Almatari's diagnosis was based upon Watkins's complaint that he was depressed and had difficulty sleeping; no other symptoms were reported by Watkins, he expressly denied suicidal or homicidal ideations and loss of weight, pleasure or appetite. (R. at 609.) The Commissioner correctly argued that the initial diagnosis occurred prior to the relevant time period, which is the date Watkins filed, September 15, 2004, through the date of the ALJ's decision on August 14, 2006. (Defendant's Memorandum In Support of Motion For Summary Judgment, ("Defendant's Brief"), at 13, 15.)

During repeated medical visits with his primary care physician, during the relevant time period, Watkins was noted as being "pleasant," with no signs of acute distress. (R. at 582, 585-587, 589, 591, 595, 662, 664, 668, 671, 673, 675, 677, 680.) In fact, since the initial diagnosis, depression did not seem to be one of Watkins's or his treating doctors' primary concerns. On March 24, 2004, Watkins told Dr. Almatari that he experienced "some depression at times." (R. at 604.) As such, Dr. Almatari placed Watkins on Amitriptyline, which according to Watkins had helped his depression and headaches. (R. at 602.) In fact, Dr. Almatari noted that Watkins was "very pleased" with the medication. (R. at 602.) Watkins did not report any problems with depression during the relevant time period, other than on December 14, 2004, when he complained of "some" depression and asked Dr. Almatari to change his medication, reporting that Zoloft worked well. (R. at 589.) During subsequent visits to Dr. Almatari, Watkins reported no additional

complaints of depression. (R. at 582, 585, 586, 587, 591, 593, 595.) On January 13, 2005, Watkins admitted that Zoloft had helped his depression. (R. at 587.)

With respect to Watkins's anxiety, Dr. Almatari first diagnosed Watkins with anxiety on July 19, 2004, after Watkins reported chest pain caused by witnessing his pet die. (R. at 600-01.) Dr. Almatari noted that Watkins experienced anger and anxiousness when arguing, just as he did when he witnessed his pet die. (R. at 600.) As a result, Dr. Almatari prescribed Valium to Watkins. (R. at 601.) During the relevant time period, Watkins complained of anxiety or problems with nerves during only one visit to SMHS, (R. at 666), although, Dr. Almatari did include anxiety in several assessments based upon Watkins's history. (R. at 582-583, 586-587, 589, 591, 593, 595, 662, 664, 668, 671, 673, 675, 677, 680.) As stated above, during these visits Watkins was found to not be in acute distress. (R. at 582, 585-587, 589, 591, 595, 662, 664, 668, 671, 673, 675, 677, 680.)

The opinions of consultative examiners and state agency psychologists support the ALJ's findings. The ALJ noted that he adopted the opinion of B. Wayne Lanthorn, Ph.D., that resulted from the March 29, 2005, consultative examination of Watkins. [13] (R. at 26, 575-581.) During the examination, Watkins provided great detail about his physical problems, while only mentioning mental health in saying that he was treated at FH on the advice of his attorney. (R. at 576-

---

[13] Subsequent to the ALJ decision, Lanthorn completed an Assessment Of Ability To Do Work-Related Activities form in which he inexplicably changed many of his findings. (R. at 875-77.) That form was completed on July 27, 2007, nearly one year after the ALJ decision. (R. at 22-29, 875-877.) Thus, the findings contained therein are outside of the relevant time period and will not be considered.

77.)  In fact, Lanthorn noted that Watkins was focused on his physical ailments and classified a bad day as when he did not feel well physically.  (R. at 578-79.)  Lanthorn found that Watkins could relate to and communicate with others, and that Watkins had the intellectual capacity to manage his own resources and funds.  (R. at 579.)  Furthermore, Lanthorn opined that Watkins had a GAF of 65, (R. at 581), indicating only "mild symptoms."  *See* DSM-IV at 32.  Lanthorn opined that Watkins could maintain socially appropriate behaviors, respond appropriately to changes in the work environment, become aware of and take precautions with respect to hazards, remember locations and work-like procedures, understand and remember simple and/or detailed instructions and interact socially.  (R. at 580.)  Lanthorn noted only "minor" limitations in Watkins's ability to maintain concentration and persistence.  (R. at 580.)  Lanthorn found that "no significant limitations [were] present."  (R. at 580.)  While Lanthorn diagnosed Watkins with depressive disorder, not otherwise specified, he noted that Watkins only exhibited "mild" symptoms.  (R. at 580.)  Lanthorn did not include anxiety within his diagnoses. (R. at 580-81.)

In addition to Lanthorn, the opinions of Julie Jennings, Ph.D., (R. at 194-206), and R.J. Milan, Jr., Ph.D., (R. at 635-47), support the decision of the ALJ.  Jennings found that Watkins suffered from depression, not otherwise specified, (R. at 197), but did not find that the impairment was severe.  (R. at 194.)  Jennings noted mere "mild" limitations with Watkins's restriction of daily activities, difficulties in maintaining social functioning and difficulties in maintaining concentration, persistence of pace.  (R. at 204.)  Moreover, based on her examination of Watkins, Jennings noted that she found Watkins's statements to be

40

"not credible."  (R. at 206.)  Similarly, Milan diagnosed Watkins with depression, not otherwise specified, and noted that it was mild, and borderline intellectual functioning.  (R. at 635, 637.)  Once again, anxiety was not included in Watkins's diagnosis, as Milan simply noted in passing that Watkins's anxiety was in remission.  (R. at 642.)  Milan only found Watkins to be moderately limited with respect to the ability to understand, remember and carry out detailed instructions. (R. at 648-49.)

The ALJ did take note of and consider the evidence relating to Watkins's alleged anxiety and depression.  (R. at 25-26.)  The ALJ adopted Lanthorn's opinion, stating that it was consistent with Lanthorn's objective findings and the remaining objective evidence of record.  (R. at 26.)  The ALJ found it more pertinent, when considering the medical evidence as a whole, that Watkins's depression was treated and not a hindrance or concern during the relevant time period.  (R. at 25-26.)  The ALJ specifically pointed out that Watkins's activities, i.e., playing games, grocery shopping, receiving visitors, traveling, etc., (R. at 578-79), were entirely inconsistent with activities of a person suffering from severe depression or anxiety.  (R. at 26.)  Furthermore, even Watkins himself opined that he was not disabled due to non-exertional impairments.[14]  (R. at 46.)  Moreover, as the previous discussion indicated, Watkins's depression and anxiety seemed to be responding to medication and/or treatment.  Relevant precedent provides that "[i[f a symptom can be reasonably controlled by medication or treatment, it is not disabling."  *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986.).

---

[14] When asked why he felt he was disabled, Watkins stated, "I can't do a whole lot of walking." (R. at 46.)

Accordingly, it is this court's opinion that the ALJ did not err in deciding that Watkins did not suffer from a severe mental impairment other than borderline intellectual functioning. I further find that substantial evidence of record supports the ALJ's decision regarding Watkins's mental limitations.

The court will next address Watkins's claim that the ALJ improperly determined his residual functional capacity. (Plaintiff's Brief at 7-8.) Watkins argues that the ALJ's failure to include limitations with respect to emphysema to be an error and in contradiction of substantial evidence. (Plaintiff's Brief at 8.) Watkins contends that, based on his physical problems, he is precluded from substantial gainful activity and totally disabled. (Plaintiff's Brief at 8.)

The findings of state agency physician, Dr. Richard Surrusco, M.D., are consistent with the ALJ's decision. (R. at 651-57.) After a review of the medical evidence of record, Dr. Surrusco found that Watkins could occasionally lift and/or carry items weighing up to 20 pounds, frequently lift and/or carry items weighing up to 10 pounds, sit, stand and/or walk for 6 hours out of a typical eight-hour workday and that Watkins's ability to push and/or pull was unlimited. (R. at 652.) Dr. Surrusco opined that Watkins could frequently climb, stoop, balance, kneel, crouch and crawl. (R. at 653.) Dr. Surrusco did not report any visual or manipulative limitations, but found that Watkins should avoid concentrated exposure to extreme heat or cold, humidity, fumes, odors, dusts, gases and poor ventilation. (R. at 654.) These findings are consistent with light work which involves the occasional lifting or carrying of items weighing up to 20 pounds at a

time, with frequent lifting or carrying of items weighing up to 10 pounds. *See* 20 C.F.R. § 416.967(b) (2009). Dr. Surrusco stated that Watkins's description of the severity of his pain was extreme and unsupported by objective evidence. (R. at 656.) Dr. Surrusco explicitly stated that he found Watkins's claims of difficulty walking and standing to not be credible. (R. at 656.)

Furthermore, there is no evidence of record to contradict the ALJ's decision or the findings of Dr. Surrusco. Watkins relies upon treatment notes from SMHS to establish the severity of his conditions, (Plaintiff's Brief at 7-8.), but the objective findings therein are not inconsistent with the ALJ's findings or the findings of Dr. Surrusco. Those notes are riddled with subjective complaints with no supporting objective findings. (R. at 582-96, 661-89, 794-95, 817-21.) Additionally, at no point does Dr. Almatari opine that Watkins is totally disabled. (582-96, 661-89, 794-95, 817-21.) Moreover, even Dr. Almatari seemed to question the credibility of Watkins's complaints, directing him to decrease his visits to the emergency room. (R. at 590.)

In making his decision, the ALJ noted that he considered claimant's subjective allegations, which he found to be not credible, and the objective evidence as a whole. (R. at 26, 28.) The ALJ found that Watkins suffered from severe physical impairments consisting of cervical disc disease, emphysema and status-post suspected old clavicle injury, but found that these conditions were not severe enough to meet or medically equal one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4. (R. at 26.) The ALJ limited Watkins to light work consistent with borderline range of intelligence. (R. at 26, 29.) With

regard to emphysema, the ALJ imposed no additional limitations because Watkins had not been referred to a pulmonary specialist, no objective findings supported environmental limitations, treatment records did not document complaints associated with respiratory impairments and Watkins's habitual cigarette abuse further diminished his credibility.  (R. at 26-27.)  With respect to the remaining physical conditions, the ALJ noted that no treating physician found Watkins to be totally disabled because of pain, he has not be hospitalized for pain or referred for pain management and his daily activities were consistent with light work.  (R. at 27.)  Watkins argues that the ALJ's findings themselves warrant more severe limitations, (Plaintiff's Brief at 7), but, as the ALJ properly concluded, those findings justify the limitation of light work.  (R. at 26-28.)

Based on the foregoing discussion, this court finds that the ALJ's decision was supported by substantial evidence of record.  Furthermore, this court finds Watkins's claim that the ALJ was substituting his opinion for that of a trained professional, (Plaintiff's Brief at 7), to be baseless as substantial evidence supports the ALJ decision.  In the absence of any evidence in support of his position the ALJ does not have the competency to substitute his opinion for that of a trained professional.  *Grimmet v. Heckler*, 607 F. Supp. 502, 503 (S.D. W. Va. 1985) (citing *McLain*, 715 F.2d at 869; *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974.)).  However, that is not what we have here; the ALJ followed the objective findings of record and as previously stated his opinion is supported by substantial evidence.

*IV. Conclusion*

For the foregoing reasons, I will affirm the final decision of the Commissioner denying benefits.

An appropriate order will be entered.

**ENTER:** This 17th day of November, 2009.

/s/  Glen M. Williams
S<small>ENIOR</small> U<small>NITED</small> S<small>TATES</small> D<small>ISTRICT</small> J<small>UDGE</small>